**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.



FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE MAY 18 2017
Fairhurst, CJ
CHIEF JUSTICE

This opinion was filed for record

at 8:00 a.m. on May 18, 2017

SUSAN L. CARLSON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) ) ) | No. 89590-2 |
| CECIL EMILE DAVIS, | ) ) | |
| Petitioner. | ) ) ) | En Banc |
| | ) ) | Filed _____ MAY 18 2017 _____ |
| _____ | ) ) | |

GONZÁLEZ, J.—Cecil Emile Davis was sentenced to death for brutally murdering Yoshiko Couch. His direct appeal was unsuccessful. He now challenges his death sentence in a personal restraint petition. He argues that Washington's death penalty system unconstitutionally fails to protect defendants with intellectual disabilities from execution. He also contends our death penalty system is unconstitutional because it does not require a jury to find, beyond a reasonable doubt, that a defendant facing the death penalty does not have an intellectual disability. Finally, he contends his trial counsel was ineffective for

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2

failing to offer certain witnesses. We find his arguments unpersuasive and dismiss the petition.

## FACTS

Davis raped, robbed, and killed 65-year-old Couch in her home in 1997. Davis was convicted of aggravated first degree murder and sentenced to death. *State v. Davis*, 175 Wn.2d 287, 300, 290 P.3d 43 (2012). His first death sentence was set aside for error. *Id.* (citing *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 101 P.3d 1 (2004)). In 2007, the State successfully sought the death penalty again. *Id.*

Both Washington law and the United States Constitution prohibit executing anyone who is intellectually disabled. RCW 10.95.030(2), .070(6); U.S. CONST. amend. VIII; *Atkins v. Virginia*, 536 U.S. 304, 311-12, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002). Davis moved to strike the death penalty proceeding on the grounds that the lack of intellectual disability is a fact that should be proved to the jury beyond a reasonable doubt, not found by a judge. The trial judge denied the motion, noting that while intellectual disability was a mitigating factor the defendant could offer to the jury, no case had ever required the State to prove the lack of an intellectual disability to the jury as a prerequisite to a death sentence. The trial judge also excluded video recordings of two of Davis's aunts discussing his childhood and family background on the grounds of hearsay, lack of personal

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2

knowledge, relevance, and "because the interviewees were not subject to cross-examination." *Davis*, 175 Wn.2d at 317. The aunts were not under oath during the video interviews, but they did sign declarations substantially summarizing their recorded statements. Davis unsuccessfully challenged the exclusion of the videos on direct review.

At sentencing, Davis's counsel did not argue that Davis was excluded from the death penalty due to an intellectual disability presently or at the time of the murder, but did argue for mercy based on Davis's difficult childhood, early learning deficits and learning disorder, low intelligence, cognitive disorder, major depression with psychotic features, and posttraumatic stress disorder, and mercy itself. The jury rejected Davis's arguments and recommended a death sentence. *Id.* at 300.

After the jury returned its verdict, the trial judge made an independent assessment of whether Davis was intellectually disabled and thus exempt from the death penalty. Largely based on the testimony of medical experts offered at trial, the judge concluded Davis was eligible for the sentence. The judge specifically noted that Davis's intelligence quotient (I.Q.) tests on record ran from 68 to 82, but that "not one single witness testified that the defendant was mentally

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2

retarded, [1] so there is in fact no substantive evidence of mental retardation."

Clerk's Papers (CP) at 1260; Report of Proceedings (RP) (May 8, 2007) at 3100.

Davis did not challenge this finding on direct review. *Davis*, 175 Wn.2d at 374

(noting that "Davis does not claim he is intellectually disabled or that he was

intellectually disabled at the time of the crime"). We affirmed his sentence on

appeal. *Id.* at 300.

After our opinion was released, we appointed counsel for Davis's collateral

attack against his death sentence and set October 11, 2014, as the deadline for

filing his personal restraint petition. Order Granting Stay of Execution, *In re Pers.

Restraint of Davis*, No. 89590-2 (Wash. Dec. 12, 2013). Meanwhile, the United

States Supreme Court found Florida's death penalty system created an

unconstitutional risk that persons with intellectual disabilities would be executed.

*Hall v. Florida*, __ U.S. __, 134 S. Ct. 1986, 2000, 188 L. Ed. 2d 1007 (2014).

Perhaps partially because of *Hall*, Davis moved for an extension of time to file his

personal restraint petition. When the State did not timely respond to Davis's

motion under RAP 17.4(e), we granted it. Order, *State v. Davis*, No. 89590-2

(Wash. Sept. 25, 2014). The next day, the State objected, contending we lacked

---

[1] The language the trial judge used was consistent with the statutes in force at the time. Since then, our legislature revised the statute under which Davis was sentenced to replace the outdated and offensive term "mentally retarded" with "intellectual disability." LAWS OF 2010, ch. 94, § 3 (formatting omitted). Except when quoting, we use the modern terminology.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2

authority to extend the deadline. The objection was placed in the file without action as untimely. Davis timely filed his opening brief and successfully moved for an order specifying that the court had extended the statutory time limitations.[2] Order, *State v. Davis*, No. 89590-2 (Wash. May 19, 2015).

ANALYSIS

1. *HALL*

Davis contends that Washington's death penalty system is unconstitutional under the Eighth Amendment, U.S. CONST. amend. VIII. Under the Eighth Amendment, "persons with intellectual disability may not be executed." *Hall*, 134 S. Ct. at 1992 (citing *Atkins*, 536 U.S. at 321). After Davis was sentenced to death, the United States Supreme Court found that Florida's death penalty statutes (which are facially similar to our death penalty statutes) unconstitutionally ignored the consensus of the relevant scientific community on the appropriate criteria for intellectual disability and failed to safeguard those with intellectual disabilities

---

[2] In its responsive brief, the State has renewed its argument that "[t]he statute of limitations set forth in RCW 10.73.090(1) is a mandatory rule that bars appellate consideration of personal restraint petitions filed after the limitations period has passed." Resp. to Pers. Restraint Pet. at 5 (citing *In re Pers. Restraint of Bonds*, 165 Wn.2d 135, 196 P.3d 672 (2008) (plurality opinion); *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 952 P.2d 116 (1998)). We do not find that holding in either opinion. The superior court and the Supreme Court in Washington have original jurisdiction to consider habeas challenges. WASH. CONST. art. IV, §§ 4, 6. The time limits in RCW 10.73.090-.100 are designed to protect the finality of judgments while permitting consideration of many potentially meritorious collateral challenges. *See In re Pers. Restraint of Coats*, 173 Wn.2d 123, 129-31, 267 P.3d 324 (2011). We find exercising our inherent power to grant a timely filed motion for extension of time is consistent with this design and reject the State's argument.

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

from execution. *Id.* at 2001 (citing FLA. STAT. § 921.137);[3] *Cherry v. State*, 959 So. 2d 702, 711-14 (Fla. 2007), *abrogated by Hall*, 134 S. Ct. 1986. The Court noted that while "[o]n its face [the Florida] statute could be interpreted consistently with *Atkins*," Florida's highest court had interpreted it in an unconstitutional manner that prevented courts from considering "substantial and weighty evidence of intellectual disability." *Hall*, 134 S. Ct. at 1994. The Court specifically noted that Washington's statute "could [also] be interpreted to provide a bright-line cutoff" for presenting evidence of intellectual disability which would make it unconstitutional under *Hall*. *Id.* at 1996 (citing RCW 10.95.030(2)(c)).

Following the United States Supreme Court's invitation, Davis argues that RCW 10.95.030(2) creates an unacceptable barrier to proof of intellectual disability that violates the Eighth Amendment's ban on "cruel and unusual punishment." Am. Pers. Restraint Pet. at 10 (Am. Pet.) (citing *Atkins*, 536 U.S. at 318). Our statute says in relevant part:

---

[3] Most relevantly, that statute provided:
> As used in this section, the term "intellectually disabled" or "intellectual disability" means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18. The term "significantly subaverage general intellectual functioning," for the purpose of this section, means performance that is two or more standard deviations from the mean score on a standardized intelligence test specified in the rules of the Agency for Persons with Disabilities.

FLA. STAT. § 921.137(1).
> This means "a test taker who performs 'two or more standard deviations from the mean' will score approximately 30 points below the mean on an IQ test, i.e., a score of approximately 70 points." *Hall*, 134 S. Ct. at 1994 (discussing FLA. STAT. § 921.137(1)).

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

In no case, however, shall a person be sentenced to death if the person had an intellectual disability at the time the crime was committed, under the definition of intellectual disability set forth in (a) of this subsection. A diagnosis of intellectual disability shall be documented by a licensed psychiatrist or licensed psychologist designated by the court, who is an expert in the diagnosis and evaluation of intellectual disabilities. The defense must establish an intellectual disability by a preponderance of the evidence and the court must make a finding as to the existence of an intellectual disability.

(a) "Intellectual disability" means the individual has: (i) significantly subaverage general intellectual functioning; (ii) existing concurrently with deficits in adaptive behavior; and (iii) both significantly subaverage general intellectual functioning and deficits in adaptive behavior were manifested during the developmental period.

(b) "General intellectual functioning" means the results obtained by assessment with one or more of the individually administered general intelligence tests developed for the purpose of assessing intellectual functioning.

(c) "Significantly subaverage general intellectual functioning" means intelligence quotient seventy or below.

(d) "Adaptive behavior" means the effectiveness or degree with which individuals meet the standards of personal independence and social responsibility expected for his or her age.

(e) "Developmental period" means the period of time between conception and the eighteenth birthday.

RCW 10.95.030(2).

While Davis may be correct that our statute could be interpreted to suffer from the same constitutional infirmity found in *Hall*, he does not show it has been in his case or any other. The trial court did not require Davis to make the sort of threshold showing that his I.Q. was 70 or lower as a prerequisite for offering evidence of intellectual disability that the *Hall* court found objectionable. Instead, counsel offered considerable evidence that Davis suffered from impaired

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2

intellectual capacity. *Davis*, 175 Wn.2d at 322; RP (May 8, 2007) at 3108. The jury considered this evidence at sentencing, and the trial court considered it separately when considering whether Davis was eligible for the death sentence. Merely because a statute could be interpreted in an unconstitutional manner does not make it unconstitutional.

Davis also seems to suggest our statutorily mandated review of his death sentence and intellectual ability under RCW 10.95.130 was constitutionally inadequate. That statute requires us to consider (among other things) "[w]hether the defendant had an intellectual disability within the meaning of RCW 10.95.030(2)." RCW 10.95.130(2)(d). Since Davis himself did not raise the issue in his appeal, we disposed of it briefly, noting:

> To have an intellectual disability considered by RCW 10.95.130(2)(d), the defendant's IQ must be 70 or below. RCW 10.95.030(2)(a), (c). At trial, no mental health expert testified that Davis's IQ was 70 or below.[4] On appeal, Davis does not claim he is intellectually disabled or that he was intellectually disabled at the time of the crime.[78] RCW 10.95.130(2)(d) therefore does not require reversal.

> ———————
> [78]At trial, Davis moved to dismiss based on a challenge to Washington's statutory scheme regarding mentally retarded defendants convicted of aggravated murder. The court denied the motion. The court also entered findings of fact that the defendant was not mentally retarded at the present time or at the time of the crime. On appeal, Davis does not

———————
[4] Unfortunately, this statement is incorrect. Dr. Richard Kobell testified that Davis "had a full scale I.Q. score of 68." RP (May 8, 2007) at 3100. But despite the low number, based on the full panoply of tests and assessments Dr. Kobell made, he determined that Davis was "functioning in the borderline range rather than the impaired or mentally retarded range." *Id.* at 3108. Davis has not shown that this error is material or requires reconsideration at this stage.

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

challenge the denial of the motion to dismiss or the court's findings and conclusions on mental retardation.

*Davis*, 175 Wn.2d at 374. Davis contends that under *Hall*, this is "an erroneous application of the current law on what evidence should be shown to demonstrate that a capital defendant is intellectually disabled [and that] RCW 10.95.030(2) is unconstitutional as in violation of the Eighth Amendment." Am. Pet. at 10.

But even if this were true (which Davis does not show), Davis fails to explain why this court's failure to make a more rigorous analysis on direct review of an issue his counsel did not raise was improper or why *Hall* requires the appellate court to do a sua sponte, searching inquiry of an issue the defendant does not raise. Nor does he show that as applied to him, RCW 10.95.030(2) is unconstitutional.

Essentially, Davis argues that he is entitled to resentencing since *Hall* makes clear that using a 70 I.Q. as an evidentiary cutoff is unconstitutional because it ignores the judgment of "'[t]he relevant clinical authorities.'" *Id.* at 12-13 (internal quotation marks omitted) (quoting *Hall*, 134 S. Ct. at 1994). He cites as evidence of his disability that he was enrolled in special education; that the doctors who examined him found his I.Q. ranged from 68 to 74; that his medication, drug use, and diabetic conditions potentially affected his mental state; and that his family history indicated that he was treated poorly as a result of being "slow." *Id.* at 15-18.

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2

But all this evidence *was* presented to the 2007 jury and considered by the

trial court in determining whether Davis must be excluded from the death penalty.

Unlike in Florida before *Hall*, here Davis's evidence of intellectual disability was

not excluded. *See Cherry*, 959 So. 2d at 714. The jury considered medical

testimony, family history, school performance, and other factors. *Davis*, 175

Wn.2d at 346-47. The defense offered the testimony of Richard Kolbell, PhD,

Barbara Jessen, MD, Zakee Matthews, MD, Kenneth Muscatel, PhD, and the

State's witness, Police Sergeant Tom Davidson. Three of these medical experts

conducted I.Q. tests, reviewed previous I.Q. tests and medical records, and spoke

to family members concerning Davis's school and family history. In reviewing the

defense's expert testimony, the trial court found:

> The three mental health witnesses who testified in this proceeding did
> not have significant differences in their opinions. All of them concluded the
> defendant has a "cognitive disorder, not otherwise specified." The
> defendant's voluntary abuse of drugs and alcohol likely exacerbated this
> condition. The defendant's cognitive disorder essentially makes him
> "slower" than "normal" people when it comes to processing information, but
> he processes it the same as "normal" people once he assimilates the
> information. No witness at this proceeding gave the opinion that the
> defendant was mentally retarded, either now, at the time of the offense, or
> ever.

CP at 1264. The trial judge also considered Sergeant Davidson's testimony that

"the defendant showed no signs of intoxication, confusion, or any other mental

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2

distraction or deficiency during his interview with the detectives [six days after the murder]." *Id.* at 1265. The trial court also found that

> [t]he defendant presented no affirmative evidence that he is now or ever has been mentally retarded. Each of the witnesses who testified at the penalty phase hearing and was specifically asked said the defendant is not mentally retarded and has never been formally diagnosed as mentally retarded during his lifetime.

*Id.* Davis has not shown that this conclusion was based on an unconstitutional understanding of RCW 10.95.030(2). Nor has he made any effort to show that had the trial court followed the procedures he now advocates, a different result would have occurred. Finally, he has not offered any evidence that should have been admitted at trial that was not.

Davis has not established that our death penalty statute, or his sentence, was unconstitutional under *Hall*.[5]

## 2. *APPRENDI*

Generally, any fact that increases the sentence a defendant might face must be charged and proved to a jury beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 485-86, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Davis argues that the lack of an intellectual disability that would make him exempt from the death penalty is such a fact, at least when intellectual disability has been raised.

---

[5] We note in passing that we are not asked to decide whether Davis is currently exempt from execution under the principles articulated in *Atkins* and *Hall*. Except for his own handwritten letters to the court, we have no evidence before us of Davis's current intellectual abilities.

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2

Am. Pet. at 18-20 (citing *Apprendi*, 530 U.S. at 485-86; *Blakely v. Washington*, 542 U.S. 296, 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004); *State v. Fero*, 125 Wn. App. 84, 98, 104 P.3d 49 (2005)). Essentially, he argues that a death penalty is an enhanced sentence that can be based only on facts admitted by the defendant or found by a jury beyond a reasonable doubt, that he is eligible for the death penalty only if he is not intellectually disabled, and that the lack of an intellectual disability effectively increases the punishment he is exposed to and thus a jury must make the decision. He also contends that once he raised his intellectual disability, the State had the burden, beyond a reasonable doubt, of proving that he was not intellectually disabled. *Id.* at 21.

But Davis fails to establish that *Atkins*'s exemption of intellectually disabled persons from the death penalty is a sentence "enhancer" under the *Apprendi* line of cases, and thus the first step of his argument fails. Davis is blending two lines of cases that interpret different provisions of the United States Constitution without showing why we should mix them in the way he proposes. Accepting his argument would require us to merge the *Atkins* line, which concerns the constitutional limitations on cruel and unusual punishment in the Eighth Amendment, with the *Apprendi* line, which concerns due process and the notice and jury trial rights embodied in the Sixth Amendment, U.S. CONST. amend. VI. *Atkins*, 536 U.S. at 307; *Apprendi*, 530 U.S. at 476. He makes no meaningful

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2

effort to show us that it is appropriate to detach the Eighth Amendment limitation on executing a person with intellectual disabilities from its Eighth Amendment roots and graft it into the Sixth Amendment and due process limitations articulated by *Apprendi* and its progeny. The State has elected not to brief this issue, depriving us of valuable argument on which to make our judgment.

Briefly, *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. But *Hall* (and *Atkins* before it) does not suggest that the *lack* of intellectual disability is a fact that increases the penalty to which a defendant is exposed under *Apprendi*. Instead, *Hall* and *Atkins* held that those who are intellectually disabled are not subject to the death penalty categorically, left it to the states to develop appropriate enforcement mechanisms, and found that one state's mechanisms were inadequate. *Atkins*, 536 U.S. at 317; *Hall*, 134 S. Ct. at 2001. Neither case suggests that the lack of intellectual disability is the functional equivalent of an element of a crime that must be charged and proved to a jury under the Sixth Amendment. Indeed, the Supreme Court expressly left "'to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Atkins*, 536 U.S. at 317 (alterations in original) (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 106 S. Ct.

13

*In re Pers. Restraint of Davis*, No. 89590-2

2595, 91 L. Ed. 2d 335 (1986)). Most notably, in *Schriro v. Smith*, the Supreme

Court admonished the Ninth Circuit for ordering an Arizona state court to conduct

proceedings and a jury trial on the issue of "mental retardation" notwithstanding its

decision to leave to the states' discretion the enforcement of *Atkins*. 546 U.S. 6, 7-

8, 126 S. Ct. 7, 163 L. Ed. 2d 6 (2005) (per curiam).[6]

Not surprisingly, courts that have considered the possible intersection of

*Apprendi* and *Atkins* have unanimously rejected it, finding the *Atkins* exemption

acts as a conclusive sentence mitigator rather than as a sentence enhancer. *State v.*

*Agee*, 358 Or. 325, 364-66, 364 P.3d 971 (2015), *as amended*, 358 Or. 749, 370

P.3d 476 (2016); *Hurst v. State*, 147 So. 3d 435, 445 (Fla. 2014) (per curiam),

*rev'd on other grounds*, ___ U.S. ___, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016);

*Pruitt v. State*, 834 N.E.2d 90, 112-13 (Ind. 2005), *rev'd on other grounds*, 788

F.3d 248 (7th Cir. 2015); *State v. Were*, 118 Ohio St. 3d 448, 477-79, 890 N.E.2d

263 (2008); *State v. Grell*, 212 Ariz. 516, 526-27, 135 P.3d 696 (2006); *State v.*

---

[6] The Court's recent application of *Apprendi* in *Hurst v. Florida*, ___U.S. ___, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016), does not dictate a different result. *Hurst* simply repeats the principles of *Apprendi* and *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), that if the maximum sentence a trial court can impose on a defendant is life absent some additional aggravator, then that aggravator must be found by the jury. It does not hold, as the dissent suggests, that the absence of an intellectual disability under *Atkins* is the equivalent of a sentence aggravator under *Apprendi*. To the contrary, the Court expressly denied certiorari review of that question. *Compare* Pet. for Writ of Cert. to Supreme Ct. of Fla., *Hurst v. Florida*, No. 14-7505 (Dec. 5, 2014) (raising multiple issues regarding the constitutionality of Florida's death penalty sentencing scheme and the jury's role in making the *Atkins'* intellectual disability determination), *with Hurst v. Florida*, 135 S. Ct. 1531, 191 L. Ed. 2d 558 (2015) (limiting review to the constitutionality of Florida's death penalty sentencing scheme).

14

*In re Pers. Restraint of Davis*, No. 89590-2

*Laney*, 367 S.C. 639, 647-49, 627 S.E.2d 726 (2006); *Walker v. True*, 399 F.3d 315, 326 (4th Cir. 2005); *Bowling v. Commonwealth*, 163 S.W.3d 361, 378-81 (Ky. 2005); *Winston v. Commonwealth*, 268 Va. 564, 616-17, 604 S.E.2d 21 (2004); *State v. Flores*, 2004-NMSC-021, 135 N.M. 759, 762-63, 93 P.3d 1264; *Howell v. State*, 151 S.W.3d 450, 465-67 (Tenn. 2004); *Russell v. State*, 849 So. 2d 95, 146-48 (Miss. 2003); *In re Johnson*, 334 F.3d 403, 404-05 (5th Cir. 2003) (per curiam); *Head v. Hill*, 277 Ga. 255, 258-59, 587 S.E.2d 613 (2003) (per curiam); *State v. Williams*, 831 So. 2d 835, 860 n.35 (La. 2002).

Those few state courts that have allocated the *Atkins* finding of intellectual disability to the jury have done so as a matter of *state* law and expressly disclaimed any federal constitutional mandate. *Commonwealth v. Sanchez*, 614 Pa. 1, 53, 36 A.3d 24 (2011) (citing *Commonwealth v. Bracey*, 604 Pa. 459, 488-90, 986 A.2d 128 (2009)); *State v. Jimenez*, 188 N.J. 390, 405-06, 408, 908 A.2d 181 (2006); *see also State v. Johnson*, 244 S.W.3d 144, 150-51 (Mo. 2008).

We reject Davis's request that we collapse *Atkins* and *Apprendi*. Davis has not shown that he was entitled to have the sentencing jury determine, beyond a reasonable doubt, whether he was intellectually disabled.

### 3. Aunts' Testimony

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2

Davis argues that he received ineffective assistance of counsel when his attorney did not ensure that his aunts' testimony was presented to the jury. Am. Pet. at 22. We review ineffective assistance of counsel claims de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P. 3d 916 (2009) (citing *In re Pers. Restraint of Fleming*, 142 Wn.2d 853, 865, 16 P.3d 610 (2001)). To prevail, Davis must establish that (1) counsel's performance was deficient and (2) the performance prejudiced the defendant's case. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). For counsel's performance to be deficient, it must fall below an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997). Our scrutiny of this performance is deferential, and we strongly presume reasonableness. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). To rebut this presumption, a defendant must establish an absence of any legitimate trial tactic that would explain counsel's performance. *Id.* In the context of counsel's investigation into mitigating factors, the Supreme Court held that "we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins v. Smith*, 539 U.S. 510, 523, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (citation omitted) (quoting *Strickland*, 466 U.S. at 688,

16

*In re Pers. Restraint of Davis*, No. 89590-2

689). For the defendant to prove that the deficient performance prejudiced the defense, the defendant must "prove that, but for counsel's deficient performance, there is a 'reasonable probability' that the outcome would have been different." *State v. Hicks*, 163 Wn.2d 477, 486, 181 P.3d 831 (2008) (quoting *State v. Cienfuegos*, 144 Wn.2d 222, 227, 25 P.3d 1011 (2001)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

After jury selection began, Davis offered recordings of interviews his mitigation specialist had with his two elderly aunts living in Kansas City, Missouri. After the State objected to showing the videos on hearsay grounds, Davis made an offer of proof. The judge watched the recordings with counsel and granted the State's motion. The judge found the video recordings were hearsay, minimally relevant, and duplicative, explaining that "[t]he relevant information is going to be available through other witnesses that are here and present, and the defense will have the benefit of those." RP (May 7, 2007) at 3057. On direct appeal, we found that exclusion of the videos was within the trial judge's discretion. *Davis*, 175 Wn.2d at 322. We observed:

> [T]he trial court correctly determined that the vast majority of Jones's and Brooks's offerings were not relevant mitigating evidence. . . .
>     . . . .

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2

A few facts offered by Davis's aunts probably meet the low bar for relevance. Jones's observation that Davis had a difficult and troubled childhood is a relevant mitigating factor. *See Eddings v. Oklahoma*, 455 U.S. 104, 116, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982). In addition, the aunts' concern had relevance on the issue of mercy, their testimony showing that two family members were willing to be interviewed on Davis's behalf. In *Stenson*, we held that the trial court did not err in excluding on relevance grounds testimony concerning the potential impact an execution would have on the defendant's family, but we noted with approval that the trial court had admitted testimony from family members indirectly showing that the defendant had a caring family. Here, in contrast, the exclusion of Davis's aunts' interviews completely eliminated the views of two family members from the jury's consideration, a fact that was underscored by the State's comment in closing argument that only two members of Davis's large family (his mother and brother) testified on Davis's behalf.

*Id.* at 319-20. Davis asserts that "[t]he only reason why this court did not find the aunts' exclusion as reason for reversal was because of the error of defense counsel in failing 'to present the relevant portions . . . in a reliable form'" and suggests counsel was deficient for not sending the investigator to interview the aunts until after the trial had begun. Am. Pet. at 25 (alteration in original). While not interviewing the aunts until after jury selection began may have been deficient, Davis's contention that the only reason this court did not reverse was because counsel erred in failing to present the information in a reliable form is not well taken. We reviewed the recording and found that most of the information was not relevant and "the few relevant parts of the interviews" were not presented in a reliable form. *Davis*, 175 Wn.2d at 321-22. Davis has not shown that counsel's

18

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

performance was deficient for failing to find a way to submit the aunts' testimony of the "few relevant parts" of the interviews.

But even assuming (without deciding) that counsel was deficient in failing to find a way to get his aunts' testimony admitted, Davis fails to show that he was prejudiced. As the trial court noted in excluding the tapes, "The relevant information is going to be available through other witnesses that are here and present." RP (May 7, 2007) at 3057. Davis's counsel submitted the medical testimony of four experts, testimony from other family members regarding Davis's family history, information about his school performance, and other mitigating evidence. Davis makes no effort to show the judge was wrong in his assessment that the evidence would be introduced in other ways. Nor does he specifically identify some additional fact that was excluded that, had the aunts' testimony been admitted, would have been offered to the jury. He contends:

> In this case, defense counsel knew that many family members were not forthcoming about Davis'[s] problems growing up but his aunts were prepared to talk about them. That knowledge should have motivated Davis'[s] attorneys to jump on the opportunity to bring the aunts' memories to the jury as a top priority. Potentially, if other family members had seen or heard the aunts' recollections, they might have been more willing to come forward with more information from Davis'[s] troubled past.

Am. Pet. at 27. This is entirely too speculative to meet his burden of showing that "but for counsel's deficient performance, there is a 'reasonable probability' that the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

outcome would have been different." *Hicks*, 163 Wn.2d at 486 (quoting *Cienfuegos*, 144 Wn.2d at 227).

Davis also contends that the aunts' "presence would have taken away the [S]tate's argument that few family members were interested in Davis'[s] life." Am. Pet. at 28-29. In the prosecutor's lengthy closing argument, he did devote a few lines to Davis's family, although he did not mention any aunts. Specifically, the prosecutor argued:

> The defendant's family, Cozetta Taylor and Donnie Cunningham[,] . . . [b]oth of them told you that they love this defendant unconditionally. . . .
>
>      . . . .
>      . . . What you got in this case was the best that could be said for Cecil Davis. He has a mother, six brother and sisters, 30-plus nieces and nephews. His mother said she also has 30-plus grandchildren, which means he has 30-plus grandnieces and nephews. You heard from two.

RP (May 15, 2007) at 3518-19. This was part of a lengthy closing by the State that paints a warm picture of Couch; graphically details Davis's assault, rape, and murder of her; graphically details her death; graphically details the state in which her body was found; details his methodical conduct after her murder; discusses theories of justice, deterrence, and compassion; paints Davis as the "worst of the worse"; details his criminal history; discusses his mental health and intellectual capacity; and discusses why he should not be given mercy. *Id.* at 3492-3540. Davis has not shown that "but for counsel's deficient performance, there is a 'reasonable probability' that the outcome would have been different" because the

*In re Pers. Restraint of Davis*, No. 89590-2

prosecutor would have had to argue that only four relatives testified on his behalf. *Hicks*, 163 Wn.2d at 486 (quoting *Cienfuegos*, 144 Wn.2d at 227).

Davis has not shown ineffective assistance for failing to get his aunts' testimony admitted.

### 4. MISSING EXPERTS

Finally, Davis contends that his trial counsel was ineffective for failing to sufficiently explore how his health, recreational drug use, and medications might have contributed to his mental state at the time of the murder. Specifically, he contends that "defense counsel was ineffective [for] not . . . consult[ing] with a toxicologist or pharmacologist . . . to educate the defense on what the effects and interaction of the drugs might do . . . and . . . to advise the jury of this information for their consideration with other mitigating information." Am. Pet. at 35.

We articulated defense counsel's relevant obligation in *In re Brett*:

> When defense counsel knows or has reason to know of a capital defendant's medical and mental problems that are relevant to making an informed defense theory, defense counsel has a duty to conduct a reasonable investigation into the defendant's medical and mental health, have such problems fully assessed and, if necessary, retain qualified experts to testify accordingly.

*In re Pers. Restraint of Brett*, 142 Wn.2d 868, 880, 16 P.3d 601 (2001); *see also In re Pers. Restraint of Yates*, 177 Wn.2d 1, 40, 296 P.3d 872 (2013) (It is "'clearly within the wide range of professionally competent assistance for defense counsel to

21

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2

rely on properly selected experts.'" (internal quotation marks omitted) (quoting *In re Davis*, 152 Wn.2d at 733)). "[F]ailure to retain an expert" for a specific medical opinion, however, "does not render counsel's performance deficient where an expert who is retained possesses the ability to make such a diagnosis." *Id.*

In *In re Brett*, we found ineffective assistance of counsel when (1) "[t]he only expert sought by counsel to evaluate [the defendant's] fetal alcohol effect was a psychologist wholly unqualified to render a medical diagnosis," (2) defense counsel made no attempt to retain a qualified expert when notified of the inadequacy, and (3) counsel failed "to deliver [the defendant's medical] records to [the psychologist] until two days before trial." 142 Wn.2d at 881. In *In re Yates*, in contrast, we found that the defendant had not made "a prima facie showing that counsel's failure to investigate mental and neuropsychological deficits constituted ineffective assistance" because his counsel had investigated mitigating factors and retained medical experts, and only failed to direct the experts to perform specific tests. 177 Wn.2d at 37-38. On collateral review, Yates offered three new medical evaluations that we found interesting; however, "while presentation of this information to the jury might have resulted in a different outcome, [the defendant] has not shown that based on the information available to trial counsel, failure to further investigate neuropsychological deficits was unreasonable." *Id.* at 39. No similar evaluations have been offered here. We simply do not know what the

22

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

missing toxicologist or pharmacologist would have said, making the evaluation of any prejudice highly speculative.

Again, any deficiency is highly doubtful. In Davis's 2007 case, the defense presented the testimony of four expert witnesses: Dr. Kolbell, a neuropsychologist; Dr. Jessen, a neurologist; Dr. Matthews, a psychiatrist; and Dr. Muscatel, a psychologist. Each doctor testified to Davis's mental condition, essentially concluding "that Davis bordered on mentally retarded but was not actually classifiable as such." *Davis*, 175 Wn.2d at 322 (footnote omitted). Dr. Jessen testified concerning "an electroencephalogram (EEG) taken of the defendant's brain in August 1997," *id.* at 323, and concluded that "no objective evidence of any neurological deficits of a gross nature" existed. RP (May 9, 2007) at 3228.

All four experts knew of Davis's health problems and drug use. Dr. Kolbell noted during his testimony that Davis used "Wellbutrin, which is an antidepressant[;] . . . Lacinopro, which is for blood pressure[;] . . . Klonopin, which is for anxiety[;] . . . Geodone, which is for treatment of psychotic disorders[;] . . . Depakote, which is a mood stabilizer[;] . . . insulin for his diabities[;] and niacin." RP (May 8, 2007) at 3109-10. He also considered the impact of diabetes on Davis's mental abilities, acknowledged the effects of diabetes and drug use on an individual's I.Q., and testified that a prior neuropsychology report authored by Dr.

23

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Lloyd Cripe had identified drug abuse, chronic diabetes, and medications as part of the cause of Davis's neurobehavioral problems. *Id.*

Dr. Jessen, a board-certified medical neurologist, evaluated Davis's EEG scan in light of his medication, drug use, and diabetes. She testified that at the time of the test, Davis was on Prozac, Ativan, Mellaril, doxepin, alcohol, and cocaine, which all possibly affected his brain waves. She also reviewed other medical records, including Davis's 1997 EEG, which included reference to toxic or metabolic encephalopathies that can be caused by medication, alcohol or cocaine use, or diabetes.

Dr. Matthews testified that he had reviewed Davis's medical records, school records, court records, police records, and multiple psychiatric evaluations. Dr. Matthews noted that Davis was on Mellaril and explained that "Mellaril isn't used that much now because of all the negative side effects to the medication." RP (May 9, 2007) at 3252. He also acknowledged that Davis's cocaine and alcohol use was a factor in his diagnosis and commented on a possible correlation between diabetes and mental illness.

Finally, Dr. Muscatel testified that Davis had substance abuse problems and diabetes. Dr. Muscatel testified that diabetes, drug, and alcohol abuse are pertinent psychiatric factors affecting intellectual disability, and talked about the effects of drug abuse and medication on the brain.

*In re Pers. Restraint of Davis*, No. 89590-2

Among the records reviewed by all four medical experts was Dr. Robert Olsen's report from Davis's 1997 trial. Dr. Olson was retained specifically to evaluate "'possible effects of diabetes and mental illness on [Davis].'" *In re Davis*, 152 Wn.2d at 725. His final report, which was viewed by Davis's 2007 experts, identified five compounding influences on Davis's behavior:

> "1. Uncontrolled diabetes mellitus.
> "2. Chronic and acute alcohol intoxication and abuse.
> "3. Chronic and acute cocaine intoxication and abuse.
> "4. An incompletely described and diagnosed psychiatric illness of potentially psychotic proportions.
> "5. A progressive decline in complex mental functioning between 1994 and 1997."

*Id.* at 726. This information was known to counsel and used by the testifying experts in forming their opinions about Davis's neurological and psychological state. Davis has failed to show counsel's decision to rely on these four experts without also consulting a toxicologist or pharmacologist was deficient.

Davis also makes no meaningful effort to show prejudice from the alleged deficiency. He has not offered a declaration from an expert that tells us what a toxicologist or pharmacologist would have said that the four experts did not. Instead, Davis contends that his previous counsel was ineffective simply because they did not retain a toxicologist or pharmacologist or "ask the experts that were retained what further inquiry needed to be made to ascertain if these drugs and combinations had any contribution to the events of January 25, 1997." Am. Pet. at

25

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2

32. In support, Davis has attached a declaration from Ronald Ness, his 2007 counsel, asserting that he "never to [his] recollection asked the [medical experts] to evaluate what the interaction of these drugs might cause in a human being who was also a diabetic." *Id.* (Decl. of Ronald D. Ness (Apr. 10, 2015) at 3). Additionally, Davis has attached psychiatric evaluations from Pierce County jail; medication logs; American Bar Association guidelines for mitigation; three medical journals outlining possible effects of medication, drug abuse, or diabetes on mental illness; and information from Prescribers' Digital Reference about the medications Davis was administered. *See* Pers. Restraint Pet., App. None of these documents establish pharmacologists or toxicologists as the only qualified professionals to make such assessments. Davis has not shown that his counsel failed to meet the relevant standards.

Nor has he shown prejudice in some other way. He claims merely that the purpose of their testimony would be twofold: "first, to educate the defense on what the effects and interactions of the drugs might do to Davis . . . and, second, to advise the jury of this information for their consideration with other mitigating information." Am. Pet. at 35. Without supporting declarations from relevant

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2

experts, this is entirely too speculative to meet Davis's burden of showing

ineffective assistance of counsel.[7]

CONCLUSION

Davis has not shown that his sentencing procedure failed to comply with

*Hall* or *Apprendi* or that he received ineffective assistance of counsel.

Accordingly, we dismiss his personal restraint petition on the merits.

---

[7] After briefing was complete, Davis sent us letters expressing dissatisfaction with his attorneys. We treated the first as a motion for appointment of new counsel and directed the parties to respond. Davis's attorneys reported that they went to Walla Walla and spoke with Davis. According to counsel, Davis was concerned because he had not heard from them and "knew from the past that he would get attention if he contacted the court." Resp. by Pet'r's Counsel Pursuant to Court Order Entered on May 9, 2016 at 3. Counsel agreed to contact Davis every month, and Davis, according to the declaration, no longer wanted new attorneys. Later, Davis sent us two more letters expressing dissatisfaction with counsel. Given that briefing was complete before Davis's letters and given that he identifies no particular defect in the briefing and provides no explanation for his conclusory allegations, we deny the request for new counsel as moot.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis,* No. 89590-2

Gonzáles, J.

WE CONCUR:

Johnson, J.

Owens, J.

Stephens, J.

Wiggins, J.

Yu, J.

*In re Pers. Restraint of Davis,* No. 89590-2

28

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2
(Gordon McCloud, J., concurring)

No. 89590-2

GORDON McCLOUD, J. (concurring)—I do not necessarily disagree with the majority's analysis of the issues, based on the briefing that we received in this case. I write, instead, to address a different issue—about enforcement of our court's own rule on appointment of counsel.

The lawyers on this case are dedicated, experienced, hardworking professionals; but collateral challenges in death penalty cases is one of the most complicated areas of the law. Our court has therefore adopted a special rule to ensure that even the most expert lawyers are experts in this very specific area of the law. There is a question about how that rule applies to Cecil Davis's lawyers in this case. It should cause us to stop, ensure that postconviction counsel are performing up to our rule-required standards, and address Davis's pro se motion for substitution of counsel[1] with our court's rule in mind.

---

[1] On April 30, 2016, Davis sent us a letter expressing dissatisfaction with his attorneys. Letter from Cecil E. Davis, Pet'r, to Ronald Carpenter, Supreme Ct. Clerk, Wash. (Apr. 30, 2016). We treated the letter as a motion for appointment of new counsel and directed counsel on both sides to respond. Davis's attorneys reported that they went to Walla Walla and spoke with Davis at the Washington State Penitentiary. Resp. by

1

*In re Pers. Restraint of Davis*, No. 89590-2
(Gordon McCloud, J., concurring)

I.      This Court Has Taken on the Responsibility To Ensure That
        Petitioner's Counsel on a Personal Restraint Petition in a Death Penalty
        Case Are Qualified

The briefing for Davis was done by counsel that our court appointed. It was

briefing on a personal restraint petition (PRP), that is, a vehicle for raising

postconviction claims, especially claims that depend on evidence outside the

existing court record. *See State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251

(1995) (PRP is proper vehicle for raising issues that require evidence not in the trial

record). That briefing did raise three claims that depend on such evidence outside

the record: (1) the claim of ineffective assistance of trial counsel for failure to

research, investigate, and obtain expert toxicologist or pharmacologist testimony on

whether Davis's untreated diabetes exacerbated his acknowledged intellectual

disabilities, (2) the claim of ineffective assistance of trial counsel for failure to ensure

---

Pet'r's Counsel Pursuant to Court Order Entered on May 9, 2016, at 2 (May 23, 2016). According to counsel, Davis was concerned because he had not heard from counsel and "knew from the past that he would get attention if he contacted the court." *Id.* at 3. Counsel agreed to contact Davis every month, and Davis, according to the declaration, no longer requested new counsel. *Id.* at 1, 3. That made this first motion moot. But on October 3, 2016, Davis again wrote this court, stating that he no longer wished to be represented by his counsel because "they are no longer interested in representing me," that they are "prejudice[d] against 'Black People,'" and that they had "file[d] a P.R.P. asking for my execution; not in so many word[s] but that's the way I took it." Letter from Cecil B. Davis, Pet'r, to counsel and Ronald Carpenter, Supreme Ct. Clerk, Wash. (Oct. 3, 2016). Counsel responded that Davis has mental health and cognitive difficulties and they knew of no reason why the motion should be granted. It remains pending.

2

*In re Pers. Restraint of Davis*, No. 89590-2
(Gordon McCloud, J., concurring)


presentation of two aunts' mitigating testimony during the penalty phase, and (3) the claim that the trial court applied the wrong legal standard when it determined that Davis did not have intellectual disabilities making him ineligible for the death penalty. Petitioner's briefing clearly identifies deficiencies in trial counsel's performance for failure to research and investigate.

But petitioner's filings show the exact same deficiency: he fails to conduct the research and investigation that he claims might have changed the outcome.[2] And the majority has rejected these claims for just that reason. Majority at 9-10, 16-17, 23-25.

---

[2] Specifically, the petition argues that trial counsel failed to engage an expert to investigate whether Davis's intellectual deficiencies were exacerbated by his untreated diabetes—but then (as the majority notes at 23-24) it too fails to present any such expert investigation or conclusions. Am. Pers. Restraint Pet. at 29-35. Without presenting such evidence, the ineffective assistance claim cannot succeed. In fact, there is not even a motion for funds to hire such an expert anywhere in our court's file. It appears that petitioner's counsel believed that they could wait until this court ordered a reference hearing before they engaged such experts. Reply to State's Resp. to Pers. Restraint Pet. at 6 (citing general information, from Prescriber's Digital Reference, regarding the potential side effects of the drugs Davis was administered, and arguing that "[a]t a hearing, Davis will present experts to verify his claims in his PRP"). *But see In re Pers. Restraint of Rice*, 118 Wn.2d 876, 885-86, 828 P.2d 1086 (1992) (to obtain a reference hearing, petitioner must "state with particularity facts which, if proven, would entitle him to relief"). Similarly, the petition argues that trial counsel failed to ensure presentation of two aunts' testimony during the penalty phase. But, as the majority notes, it does not present any additional evidence about what those aunts would have said (in addition to the material presented and rejected on direct appeal) and how that could have affected the outcome. Majority at 17-18.

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2
(Gordon McCloud, J., concurring)

The State, for its part, filed a response that argued only two procedural issues—untimeliness and lack of evidence to support the ineffective assistance claims—and failed to address the other, substantive, claims raised. Resp. to Pers. Restraint Pet. at 24 ("reserv[ing]" the right to respond to substantive issues). But, as the majority notes, this court had already decided the timeliness issue adversely to the State. Majority at 5 n.2. Our court nevertheless granted the State's request for additional time within which to file a brief that did respond to the substantive issues. Order Granting Permission to File Br. on Merits, *In re Pers. Restraint of Davis*, No. 89590-2 (Wash. Dec. 3, 2015). The State declined to do so.

In an ordinary case, we could proceed with insufficient briefing and do our own best research and analysis, despite limited aid from the parties. But this is not an ordinary case. First, it's a death penalty case. Second, it's a case in which the petitioner himself filed a motion for substitution of counsel that remains pending. *See supra* note 1. Third, it's an exceptional case in which we, ourselves, are responsible for petitioner's counsel—we maintain the list of qualified counsel, and we appoint qualified counsel from that list. Rules of Appellate Procedure (RAP) 16.25, states in part,

> A list of attorneys qualified for appointment in death penalty personal restraint petitions will be recruited and maintained by a panel created by the Supreme Court. In appointing counsel, the Supreme

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2
(Gordon McCloud, J., concurring)

Court will consider this list. However, the Supreme Court will have the final discretion in the appointment of counsel in personal restraint petitions in capital cases.

Since we have shouldered the duties to appoint counsel for death penalty PRPs and to ensure that those counsel are qualified, we have an obligation to ensure that we fulfill those duties.

II.    Our Rule Requires That Counsel Appointed To Represent a Petitioner on a PRP in a Death Penalty Case Have Experience with PRPs; There Is No Showing That the Lawyers on Davis's Case Have Such Experience

RAP 16.25 governs appointment of counsel on PRPs in capital cases.  It provides in relevant part,

> Appointed counsel must have demonstrated the necessary proficiency and commitment which exemplifies the quality of representation appropriate to capital cases.  At least one attorney so appointed must have at least three years of experience in handling appeals or collateral reviews on criminal convictions and must be learned in the law of capital punishment by training or experience.

RAP 16.25.  This standard differs from the standard for appointment of counsel at capital trials, Superior Court Special Proceedings Rules—Criminal (SPRC) 2; one of the key differences is that it includes the requirement of experience "in handling appeals or collateral reviews."

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2
(Gordon McCloud, J., concurring)

The importance of such experience for a lawyer in a death penalty case cannot be overstated. This standard came about as a result of the work of the Supreme Court Committee to Study Indigent Appellate Defense in Capital Cases in Washington (Committee), chaired by Justice Richard Guy, in 1995.[3] Following recommendations of a subcommittee composed of members of the defense bar, the prosecution, and the judiciary,[4] the Committee endorsed the belief that "[a] rule should be adopted that provides: 'Counsel appointed in a capital case shall be learned in the law of capital punishment by virtue of training and experience.'"[5] The minutes show different views on who should maintain the list and determine postconviction counsel's qualifications.[6] But the final report does not show any dispute about the

---

[3] SUPREME CT. COMM. TO STUDY INDIGENT APPELLATE DEF. IN CAPITAL CASES IN WASH., REPORT TO THE APPELLATE INDIGENT DEFENSE COMMISSION OF THE SUPREME COURT OF WASHINGTON (1995) (Report), [https://perma.cc/7KWX-D8MH].

[4] The minutes for the first meeting indicate that Tim Ford chaired the Assignment of Capital Cases and Qualifications of Defense Counsel Subcommittee and that its members were: "Robert Boruchowitz, Jeffrey Robinson, Jeffrey Sullivan, Paul Weisser, Representative from [Washington Appellate Defender Association], Justice Richard Guy (non voting)." Meeting Min. of Supreme Ct. Comm. To Examine Appellate Representation in Capital Cases (Apr. 7, 1995) at 3 (Minutes), [https://perma.cc/Z5R3-JADQ]

[5] Report, *supra*, at 20 (underlining omitted).

[6] Minutes, *supra*, at 1.

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

standard.[7] And the standard provided by the Committee is basically the standard that this court adopted in RAP 16.25.

The rule, as adopted, uses the disjunctive "or" to indicate that counsel must have prior experience either with appeals or collateral reviews, i.e., PRPs. And, theoretically, substantial experience with one might lessen the problem with lack of experience with the other. But the two are very different. A PRP is an original action, not an appeal or revisory proceeding. It is also an original *civil* action, not a criminal case. It is therefore more like a federal habeas corpus proceeding or a trial in the need for presentation of factual evidence often outside the record. Lack of experience with that process—which is at the heart of many PRP claims—might well doom the petitioner. I would therefore clarify that the "or" in RAP 16.25 is there because that rule applies to appointment of counsel on death penalty appeals, as well as death penalty PRPs. Experience solely with appeals might suffice for a lawyer appointed in a death penalty appeal. But experience with PRPs is required for at least one of the lawyers appointed on a death penalty PRP.

---

[7] Report, *supra*, at 20.

*In re Pers. Restraint of Davis*, No. 89590-2
(Gordon McCloud, J., concurring)


Davis's principal attorney's application to the qualifications panel is impressive.[8] He clearly has a wealth of trial experience in complex criminal cases, including murder, aggravated murder, and death penalty cases. He has numerous successes in these difficult cases, too. He is an exceptionally qualified criminal defense trial lawyer and death penalty trial lawyer. He has taught, presented, and assisted other lawyers with their training in those fields. But there is one area in which his qualifications are lacking: his application to the qualifications panel shows no prior experience with PRPs. Indeed, the answer to question 5, "Personal Restraint Petition Experience," is blank.[9] And the answer to the question about prior appellate experience lists only one case.[10]

This does not *necessarily* indicate inability to handle a PRP in a death penalty case; when there is more than one lawyer on a case, each lawyer can bring a different type of expertise. But his cocounsel on this PRP is not even on our list of death penalty PRP-qualified lawyers. Thus, despite the fact that we were the ones who

---

[8] Capital Case Appointment Appl. of [Principal Att'y], Questionnaire for Att'ys regarding Qualifications as Trial, Appellate & Postconviction Counsel under SPRC 2 & RAP 16.25 (Jan. 19, 1999) (on file with court).

[9] *Id.* at 8.

[10] *Id.* at 7.

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2
(Gordon McCloud, J., concurring)

appointed her, I find no record that she has experience in the areas in which the principal attorney is lacking.

I think that we should take the time to clarify the requirements of RAP 16.25 and determine whether appointed counsel's credentials comply with those requirements. I would hold that RAP 16.25 requires at least one of the lawyers appointed to a death penalty PRP to have prior experience with PRPs. Based on the limited contents of our files, it appears that counsel's qualifications to handle this complex, collateral challenge, governed by a set of complicated and PRP-specific rules, might be lacking. A hearing on this factual question is therefore necessary.

III. Our Rule Also Requires That Counsel Appointed To Represent a Petitioner in a PRP in a Death Penalty Case Be "Learned in the Law of Capital Punishment by Training or Experience"; We Should Interpret That To Mean Learned in How To Present Death Penalty Issues in a PRP, and There Is a Question about Counsel's Abilities in That Regard

As discussed above, RAP 16.25 provides in part, "Appointed counsel must have demonstrated the necessary proficiency and commitment which exemplifies the quality of representation appropriate to capital cases. At least one attorney so appointed . . . must be learned in the law of capital punishment by training or experience."

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2
(Gordon McCloud, J., concurring)

As discussed above, both of petitioner's lawyers are generally experienced, proficient, committed, and learned. But RAP 16.25 cannot be interpreted to require a lawyer with such qualifications in general. I believe that this separate prerequisite to appointment of counsel must also be interpreted to require at least one of the lawyers on a postconviction petition to have background in PRP procedure.

Indeed, a similar phrase—"learned in the law applicable to capital cases"—in the statute governing appointment of counsel in federal death penalty cases, 18 U.S.C. § 3005, has been the subject of several federal court decisions. Federal courts have struggled with the meaning of that phrase, but they have consistently held that it means far more than just general trial or appellate expertise. *E.g.*, *United States v. Miranda*, 148 F. Supp. 2d 292, 294 (S.D.N.Y. 2001) (citing with approval requirements that among other things, included "'distinguished prior experience in the trial, appeal, *or post-conviction review* of federal death penalty cases, or distinguished prior experience in *state* death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will *assure high quality representation*'" (quoting SUBCOMM. ON FED. DEATH PENALTY CASES OF COMM. ON DEF. SERVS., JUDICIAL CONFERENCE OF THE U.S., FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION at 20 (1998) (some emphasis added),

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

http://www.uscourts.gov/sites/default/files/original_spencer_report.pdf,

[https://perma.cc/A998-2EHQ])); *see United States v. Boone*, 245 F.3d 352, 360 (4th

Cir. 2001) ("[t]he Tenth Circuit held that counsel must now be 'learned in the law

applicable to capital cases' not merely 'learned in the law' as was necessary under

the previous version of [the statute]" (quoting *United States v. McCullah*, 76 F.3d

1087, 1098 (10th Cir. 1996))).

I think that we should take the time to clarify the meaning of that phrase in

our RAP 16.25. I read that rule, in light of its background, to require that (1) at least

one of the lawyers appointed to the PRP must have prior experience with PRPs and

(2) that prior PRP-experienced lawyer be "learned in the law of capital punishment"

as it relates to PRPs. RAP 16.25.

The presentation of the ineffective assistance of counsel claims in this death

penalty PRP might be wanting under that standard.

As discussed above, Davis raised two claims of ineffective assistance of

counsel—one concerning trial counsel's failure to research, investigate, and obtain

expert toxicologist or pharmacologist testimony on whether Davis's untreated

diabetes exacerbated his acknowledged intellectual disabilities and one concerning

trial counsel's failure to ensure presentation of two relatives' testimony during the

penalty phase. But the majority correctly faults petitioner's briefing for suffering

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2
(Gordon McCloud, J., concurring)

the exact same deficiency that plagued trial counsel: that the briefing fails to present the research and investigation that it claims might have changed the outcome. And the majority has rejected these claims of ineffective assistance for just that reason. Majority at 16-17, 23-24. To be sure, one plausible explanation is that the lawyers did the investigation and research but found no support for this claim. That, however, is doubtful; they made no request for funding for either a toxicologist or a pharmacologist, so it is hard to believe that any such expert gave them a report that sank this claim. It may be that petitioner's counsel simply misunderstood the requirements for presenting factual data and obtaining a hearing in a PRP. *See supra* note 2.

The presentation of the *Hall v. Florida* claim raises a similar red flag. __ U.S. __, 134 S. Ct. 1986, 188 L. Ed. 2d 1007 (2014).

*Hall* held that following *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), the Eighth Amendment, U.S. CONST. amend. VIII, bars state courts from excluding all exploration of a capital defendant's intellectual disability solely on the basis that his or her IQ (intelligence quotient) score was more than 70. 134 S. Ct. at 1990. And Davis's counsel are correct that Washington's RCW 10.95.030(2)(a) might be interpreted to permit what the Supreme Court has declared unconstitutional—indeed, this court *did* interpret it that way in Davis's

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

direct appeal. *See* majority at 8 & n.4 (acknowledging our statement in that appeal that "'[t]o have an intellectual disability considered by RCW 10.95.130(2)(d), the defendant's IQ must be 70 or below' . . . as well as our erroneous conclusion that at Davis's trial 'no mental health expert testified that Davis's IQ was 70 or below'" (quoting *State v. Davis*, 175 Wn.2d 287, 374, 290 P.3d 43 (2012))). But there is no evidence that the trial court interpreted RCW 10.95.030(2)(a) in that same unconstitutional manner at Davis's resentencing. Instead, as the majority points out, the trial judge at that resentencing hearing *admitted* three defense expert witnesses' testimony on intellectual disability and concluded that Davis was eligible for execution because "[n]o witness . . . gave the opinion that [he] was mentally retarded." Clerk's Papers at 1264 (*State v. Davis*, No. 80209-2 (Wash. Sept. 20, 2012)).

Counsel now argue that these witnesses' testimony—evidence the trial court already considered—should be reconsidered in light of *Hall*. They are certainly correct that Davis would be entitled to a new hearing on intellectual disability if he could show a possibility of prevailing under *Hall*'s standard. *See Brumfield v. Cain*, __ U.S. __, 135 S. Ct. 2269, 2281-82, 192 L. Ed. 2d 356 (2015) (even under deferential standard by which federal courts review habeas corpus claims challenging state court convictions and sentences, state court violated *Atkins*'s

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

protections when it denied the petitioner's request for a new hearing on intellectual disability; this was true in part because "[a]t his pre-*Atkins* trial, Brumfield had little reason to investigate or present evidence relating to intellectual disability"). But they have offered no expert testimony to that effect. Majority at 11 (PRP counsel "has [not] . . . made any effort to show that had the trial court followed the procedures [Davis] now advocates, a different result would have occurred").

Again, this raises concerns about counsel's knowledge of PRP requirements. As with the ineffective assistance claims, counsel does not argue that Davis actually *has* an intellectual disability under a proper, post-*Hall* standard. Instead, they argue only that the mitigation evidence Davis submitted at his 2007 resentencing "is critical to a determination of intellectual disability and *should be explored* in that context before a sentencing jury." Am. Pers. Restraint Pet. at 15-18 (emphasis added). As with the ineffective assistance claims, this might reflect a failure to understand the requirements for raising a material question of fact in a PRP. Accordingly, I think that under RAP 16.25, we have the obligation to explore whether this aspect of the *Hall* claim should have been further researched, investigated, and briefed, and, if so, whether counsel's performance in this particular collateral challenge fell below the familiarity-with-PRPs and "learned in the law of capital punishment" standards. RAP 16.25.

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2
(Gordon McCloud, J., concurring)

Finally, the *Apprendi*[11] claim raises similar concerns. The petition raises the claim that post-*Apprendi*, the question of intellectual disability must be decided by a jury rather than a judge. Am. Pers. Restraint Pet. at 18-22. This is a complex constitutional issue. Petitioner cites only *Apprendi* and *Blakely v. Washington*, 542 U.S. 296, 304-06, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), and, according to the majority, makes little effort to address the key issue: whether intellectual disability is the functional equivalent of an element for Fourteenth Amendment, U.S. CONST. amend. XIV, purposes or some other type of mitigating factor relevant only to Eighth Amendment concerns. Majority at 12 (concluding that Davis is attempting to merge Fourteenth Amendment holdings of *Apprendi* and *Blakely* with Eighth Amendment holding of *Atkins*, and that the due process line of cases does not necessarily apply to that Eighth Amendment case). And, as the majority notes, "The State has elected not to brief this issue, depriving us of valuable argument on which to make our judgment." *Id.* at 13.

I would not rush to judgment without appropriate briefing on both sides. To be sure, there are post-*Atkins* and post-*Apprendi* cases that hold that a state trial court judge, rather than a jury, can decide whether a defendant is categorically excluded

---

[11] *Apprendi v. New Jersey*, 530 U.S. 466, 485-86, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

15

*In re Pers. Restraint of Davis*, No. 89590-2
(Gordon McCloud, J., concurring)

from eligibility for the death penalty due to intellectual disability. *E.g.*, *State v. Grell*, 212 Ariz. 516, 525-27, 135 P.3d 696 (2006). And *Apprendi* itself did expressly exclude death penalty cases from its holding. 530 U.S. at 496-97.

But there are now post-*Atkins* and post-*Apprendi* cases—not cited in this current petition—that hold the Fourteenth Amendment *Apprendi* line of cases *do* apply to death penalty decisions. Specifically, the petition fails to cite *Hurst v. Florida*, __ U.S. __, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016), and *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), on which Hurst was based. In *Ring*, decided one year after *Apprendi*, the Supreme Court held that "the required finding [of an aggravated circumstance] expose[d] [Ring] to a greater punishment than that authorized by the jury's guilty verdict," and hence had to be decided by the jury. 536 U.S. at 604. *Hurst* holds that Florida's capital sentencing scheme is unconstitutional, under the Fourteenth and Sixth Amendments, because it gives the jury only an advisory recommendation on the existence of mitigating and aggravating factors and the appropriate weight to give each—but gives the judge the final decision. U.S. CONST. amend. VI. The *Hurst* Court explained of *Ring*'s holding that "[h]ad Ring's judge not engaged in any factfinding, Ring would have received a life sentence. . . . Ring's death sentence therefore violated his right to have a jury find the facts behind his punishment." 136 S. Ct. at 621.

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2
(Gordon McCloud, J., concurring)

The *Hurst* Court then explained the expansive reach of *Apprendi*'s due process clause holding as encompassing far more than traditional elements, and as including prerequisites to the imposition of a sentence of death:

> In *Apprendi* . . . , this Court held that any fact that "expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict" is an "element" that must be submitted to a jury. In the years since *Apprendi*, we have applied its rule to instances involving plea bargains, *Blakely* . . . , sentencing guidelines, *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), criminal fines, *Southern Union Co. v. United States*, 567 U.S. [343], 132 S. Ct. 2344, 183 L. Ed. 2d 318 (2012), mandatory minimums, *Alleyne* [*v. United States*], 570 U.S. [__] at __, 133 S. Ct. [2151,] . . . 2166, [186 L. Ed. 2d 314 (2013)] and, in *Ring* . . . capital punishment.

136 S. Ct. at 621.

Following *Hurst*, the Florida Supreme Court has overturned death sentences in cases decided under its sentencing scheme that allowed judges, not juries, to find and weigh aggravating factors as a prerequisite to imposing a sentence of death. For example, in *Mosley v. State*, 209 So. 3d 1248 (Fla. 2016), the Florida Supreme Court held:

> In the words of Justice Scalia, *Ring* brought about "new wisdom":
>
>> The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death.

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Id.* at 1279 (citing and quoting *Ring*, 536 U.S. at 609).

This analysis—particularly the *Hurst* Court's observation that "[h]ad Ring's judge not engaged in any factfinding, Ring would have received a life sentence. . . . Ring's death sentence therefore violated his right to have a jury find the facts behind his punishment"—certainly goes a long way to addressing the majority's holding about the separation between the Court's Fourteenth Amendment cases and its Eighth Amendment cases. 136 S. Ct. at 621.

I certainly cannot fault the majority for overlooking cases and arguments that the petitioner did not present. But I think that under RAP 16.25, we have the obligation to explore whether this aspect of the *Apprendi* claim should have been further researched, investigated, and briefed, and, if so, whether counsel's performance in this particular collateral challenge fell below the familiarity-with-PRPs and "learned in the law of capital punishment" standards. RAP 16.25.

## CONCLUSION

This court has a duty to decide Davis's pro se motion for substitution of counsel and a duty to ensure compliance with RAP 16.25's standards. I would refer this case to the trial court, pursuant to RAP 16.11-.13, to answer the factual questions about counsel's prior experience with PRPs in general, prior experience with PRPs in death penalty cases, and familiarity with the *Rice* case. *In re Pers. Restraint of*

18

*In re Pers. Restraint of Davis*, No. 89590-2
(Gordon McCloud, J., concurring)

*Rice*, 118 Wn.2d 876, 885-87, 828 P.2d 1086 (1992). Our court would then be in a position to answer the remaining legal questions: (1) Does appointed counsel meet RAP 16.25's familiarity with PRPs and "learned in the law of capital punishment" standards? (2) If not, shall we enforce those standards that we ourselves adopted? And (3) should Davis's motion for appointment of new counsel be granted?

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Davis*, No. 89590-2
(Gordon McCloud, J., concurring)

Gordon McCloud, J.

Fairhurst, C.J.

20

*In re Pers. Restraint of Davis (Cecil E.)*

No. 89590-2

MADSEN, J. (dissenting)—The majority holds that personal restraint petitioner Cecil Emile Davis was not entitled to have a jury determine whether he was intellectually disabled, rejecting Davis's argument that *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L.Ed.2d 435 (2000), requires a jury to make this fact determination that exposes Davis to the ultimate punishment—the death penalty. *See* majority at 11-15. I disagree. In my view, the United States Supreme Court's recent decision in *Hurst v. Florida*, ___ U.S. ___, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016), effectively extends *Apprendi* to the intellectual disability inquiry in this death penalty context and in the present case requires reversal of Davis's death sentence.[1]

I begin with the requirements of RCW 10.95.030, under which life imprisonment without parole is the presumptive sentence for aggravated first degree murder. RCW 10.95.030(1) provides in relevant part that "[e]xcept as provided in subsections (2) and (3) of this section, any person convicted of the crime of aggravated first degree murder *shall be sentenced to life imprisonment without possibility of release or parole*."[2] (Emphasis added.) Subsection (2) applies here and provides as follows:

---

[1] The Supreme Court issued the *Hurst* decision after the parties had filed their briefs in this case.
[2] Subsection (3) concerns "an offense committed prior to the [defendant's] sixteenth birthday" and is not relevant here. RCW 10.95.030(3).

No. 89590-2
Madsen, J., dissenting

> If, pursuant to a special sentencing proceeding held under RCW 10.95.050, the trier of fact finds that there are not sufficient mitigating circumstances to merit leniency, the sentence shall be death. *In no case, however, shall a person be sentenced to death if the person had an intellectual disability at the time the crime was committed,* under the definition of intellectual disability set forth in (a) of this subsection. A diagnosis of intellectual disability shall be documented by a licensed psychiatrist or licensed psychologist designated by the court, who is an expert in the diagnosis and evaluation of intellectual disabilities. The defense must establish an intellectual disability by a preponderance of the evidence *and the court must make a finding as to the existence of an intellectual disability.*

RCW 10.95.030(2) (emphasis added).[3] Under this statute, the sentencing judge must make a factual finding crucial to (and in fact determinative of) the threshold availability of the death penalty as to Davis, that is, whether he has an intellectual disability rendering him ineligible for the death penalty. *Id.* Here, the trial court made the statutorily required finding. The question, however, is whether such determination by the trial court in this context violates the Sixth Amendment. U.S. CONST. amend. VI. I now turn to *Hurst*, which answers that question.

_____

[3] The statute's subsection (2) also provides the following definitions:

    (a) "Intellectual disability" means the individual has: (i) Significantly subaverage general intellectual functioning; (ii) existing concurrently with deficits in adaptive behavior; and (iii) both significantly subaverage general intellectual functioning and deficits in adaptive behavior were manifested during the developmental period.
    (b) "General intellectual functioning" means the results obtained by assessment with one or more of the individually administered general intelligence tests developed for the purpose of assessing intellectual functioning.
    (c) "Significantly subaverage general intellectual functioning" means intelligence quotient seventy or below.
    (d) "Adaptive behavior" means the effectiveness or degree with which individuals meet the standards of personal independence and social responsibility expected for his or her age.
    (e) "Developmental period" means the period of time between conception and the eighteenth birthday.
RCW 10.95.030(2).

2

No. 89590-2
Madsen, J., dissenting

In *Hurst*, the Supreme Court clarified the reach of *Apprendi*'s requirements as to

the Sixth Amendment in the context of death penalty cases. The *Hurst* Court's analysis

acknowledged the broad application of *Apprendi* in subsequent cases, explaining as

follows:

> The Sixth Amendment provides: "In all criminal prosecutions, the
> accused shall enjoy the right to a speedy and public trial, by an impartial
> jury. . . ." This right, in conjunction with the Due Process Clause, requires
> that each element of a crime be proved to a jury beyond a reasonable doubt.
> *Alleyne v. United States*, 570 U.S. ___, ___, 133 S.Ct. 2151, 2156, 186
> L.Ed.2d 314 (2013). In *Apprendi v. New Jersey*, 530 U.S. 466, 494, 120
> S.Ct. 2348, 147 L.Ed.2d 435 (2000), this Court held that any fact that
> "expose[s] the defendant to a greater punishment than that authorized by
> the jury's guilty verdict" is an "element" that must be submitted to a jury.
> In the years since *Apprendi*, we have applied its rule to instances involving
> plea bargains, *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159
> L.Ed.2d 403 (2004), sentencing guidelines, *United States v. Booker*, 543
> U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), criminal fines, *Southern
> Union Co. v. United States*, 567 U.S. [343], 132 S.Ct. 2344, 183 L.Ed.2d
> 318 (2012), mandatory minimums, *Alleyne*, 570 U.S., at ___, 133 S.Ct., at
> 2166 and, in *Ring* [*v. Arizona*], 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d
> 556 [(2002)], capital punishment.

*Hurst*, 136 S. Ct. at 621. The *Hurst* Court then explained that "[i]n *Ring,* we concluded

that Arizona's capital sentencing scheme violated *Apprendi*'s rule because the State

allowed a judge to find the facts necessary to sentence a defendant to death." *Id. Hurst*

observed that in *Ring*, "'"the required finding"'" in question that was made by the trial

court "'"exposed Ring to a greater punishment than that authorized by the jury's guilty

verdict."'" *Hurst*, 136 S. Ct. at 621 (quoting *Ring*, 536 U.S. at 604 (quoting *Apprendi,*

530 U.S. at 494)).

3

No. 89590-2
Madsen, J., dissenting

The *Hurst* Court noted with approval the State of Florida's concession "that *Ring* required a jury to find every fact necessary to render Hurst *eligible* for the death penalty." *Id.* at 622 (emphasis added). The *Hurst* Court observed that "the Florida sentencing statute does not make a defendant eligible for death until 'findings *by the court* that such person shall be punished by death.'" *Id.* (quoting FLA. STAT. § 775.082(1). The Hurst Court concluded, "As with Timothy Ring, the maximum punishment Timothy Hurst could have received without any judge-made findings was life in prison without parole. As with Ring, a judge increased Hurst's authorized punishment based on her own factfinding. In light of *Ring,* we hold that Hurst's sentence violates the Sixth Amendment." *Id.*

Here, the threshold availability of the death penalty turns on an evaluation of the evidence presented by the defendant at the special sentencing proceeding concerning intellectual disability and a finding thereon by the trial court under RCW 10.95.030(2). *Ring*, as applied in *Hurst,* requires that such factual determination be made by the jury and not the trial judge. Accordingly, in my view, that portion of RCW 10.95.030(2) requiring "the court" to "make a finding as to the existence of an intellectual disability," a finding that is determinative of Davis's threshold eligibility for the death penalty, violates the Sixth Amendment as applied in *Hurst*, 136 S. Ct. at 622.

I disagree with the majority's characterization of the *Hurst* decision as limited and inapplicable here. *See* majority at 14 n.6. The majority cites to the petition for review and the Supreme Court's order granting review in *Hurst* but overstates the parameters

4

No. 89590-2
Madsen, J., dissenting

placed on the scope of review. The Supreme Court's order granting review merely rearticulated the question before it and did not exclude anything relevant here.[4]

The majority disregards *Hurst*. The majority's discussion turns on how the fact inquiry affecting the sentencing determination is to be labeled (e.g., as an element of a crime, aggravating factor, or sentence enhancement), and stresses maintaining a division

---

[4] The petition for review in *Hurst* articulated the issues as follows:

> Issue I: Whether the Florida Supreme Court correctly held that the jury in a death penalty case does not have a constitutional obligation to render a verdict in the penalty phase [on] whether the defendant is mentally retarded or not when evidence has been presented to support such a conclusion.

> Issue II: Whether the Supreme Court of Florida has correctly concluded that this court['s] decision in *Ring v. Arizona*, 536 U.S. 584 (2002) (1) has no applicability to Florida's death sentencing scheme generally, (2) that specifically it does not require the jury's recommendation of death be unanimous, (3) that the jury's findings of aggravating factors need not be unanimous, (4) *that the jury has no role in determining the factual issue of the defendant's mental retardation*, and (5) that the lack of unanimity does not offend our evolving standards of decency as required by the Eighth Amendment.

Pet. for Writ of Cert. to Supreme Ct. of Fla. at ii, *Hurst v. Florida*, No. 14-7505 (filed Dec. 3, 2014) (emphasis added) (capitalization omitted). The Supreme Court order granting review stated:

> Petition for writ of certiorari to the Supreme Court of Florida granted limited to the following question: Whether Florida's death sentencing scheme violates the Sixth Amendment or the Eighth Amendment in light of this Court's decision in *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

*Hurst v. Florida*, 135 S. Ct. 1531, 191 L. Ed. 2d 558 (2015). As can be seen, the order granting review subsumes questions regarding the jury's role and the court's role in determining factual issues regarding defendant's mental retardation or any other question bearing on imposition of the death penalty. Accordingly, the majority does not convince that *Hurst* is inapplicable here based on the language of the order granting review.

Further, despite mentioning the Eighth Amendment in the order granting review, the *Hurst* opinion states, "We granted certiorari to resolve whether Florida's capital sentencing scheme violates the Sixth Amendment in light of *Ring*." *Hurst*, 136 S. Ct. at 621. The *Hurst* majority does not mention the Eighth Amendment, but the *Hurst* concurrence states, "I concur in the judgment here based on my view that 'the Eighth Amendment requires that a jury, not a judge, make the decision to sentence a defendant to death.'" *Id.* at 624 (Breyer, J., concurring) (quoting *Ring*, 536 U.S. at 614 (Breyer, J., concurring)). In my view, the Supreme Court's dispositive application of the Sixth Amendment and *Ring* in *Hurst* cannot be ignored in the present case.

5

No. 89590-2
Madsen, J., dissenting

between Eighth Amendment and Sixth Amendment jurisprudence. U.S. CONST. amend. VIII. But *Hurst* reasserts the core principle of *Apprendi* and *Ring*. The salient question is this: Does the inquiry at issue concern a fact that impacts the level of punishment imposed on the defendant? If so, a jury must decide it. As Justice Scalia bluntly stated in *Ring*, "[T]he fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that *all facts essential to imposition of the level of punishment that the defendant receives*—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane—*must be found by the jury*." 536 U.S. at 610 (Scalia, J., concurring) (emphasis added). Applying *Ring*, the *Hurst* Court reiterated, "The Sixth Amendment requires *a jury, not a judge, to find each fact necessary* to impose a sentence of death." 136 S. Ct. at 619 (emphasis added). As discussed above, the Supreme Court in *Hurst* held that the comparable judge-made determination in the *Hurst* case violated the Sixth Amendment under *Ring*. In my view, a similar conclusion is unavoidable here.

The majority focuses on the Eighth Amendment, citing to numerous cases[5] addressing *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002),[6]

---

[5] *See* majority at 13-15 (citing cases including *Schriro v. Smith*, 546 U.S. 6, 126 S. Ct. 7, 163 L. Ed. 2d 6 (2005); *State v. Agee*, 358 Or. 325, 364 P.3d 971 (2015), *adhered to as amended on other grounds*, 358 Or. 749, 370 P.3d 476 (2016); *Hurst v. State*, 147 So. 3d 435 (Fla. 2014), *rev'd on other grounds*, ___ U.S. ___, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016); *Pruitt v. State*, 834 N.E.2d 90 (Ind. 2005), *rev'd on other grounds*, 788 F.3d 248 (7th Cir. 2015); *State v. Were*, 118 Ohio St. 3d 448, 890 N.E.2d 263 (2008); *State v. Grell*, 212 Ariz. 516, 135 P.3d 696 (2006); *State v. Laney*, 367 S.C. 639, 627 S.E.2d 726 (2006); *Walker v. True*, 399 F.3d 315 (4th Cir. 2005); *Bowling v. Commonwealth*, 163 S.W.3d 361 (Ky. 2005); *Winston v. Commonwealth*, 268 Va. 564, 604 S.E.2d 21 (2004); *State v. Flores*, 2004-NMSC-021, 135 N.M. 759, 93 P.3d 1264; *Howell v. State*, 151 S.W.3d 450 (Tenn. 2004); *Russell v. State*, 849 So. 2d 95 (Miss. 2003); *In re Johnson*, 334 F.3d 403 (5th Cir. 2003); *Head v. Hill*, 277 Ga. 255, 587 S.E.2d 613 (2003); *State v. Williams*, 831 So. 2d 835 (La. 2002)).

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 89590-2
Madsen, J., dissenting

as supporting the notion that the *Atkins* Eighth Amendment exemption, which bars

execution of mentally retarded criminals, acts as a sentence mitigator instead of a

sentence enhancer. But all of the cases cited by the majority predate *Hurst,* and none

foreclose the availability of the Supreme Court's most recent precedent addressing Sixth

Amendment requirements in this death penalty context. *Hurst* itself acknowledges the

dynamic and continuing evolution of Sixth Amendment jurisprudence, stating:

> [I]n the *Apprendi* context, we have found that "*stare decisis* does not
> compel adherence to a decision whose 'underpinnings' have been 'eroded'
> by subsequent developments of constitutional law." *Alleyne,* 570 U.S., at —
> —, 133 S.Ct., at 2155 (SOTOMAYOR, J., concurring); see also *United
> States v. Gaudin,* 515 U.S. 506, 519-520, 115 S.Ct. 2310, 132 L.Ed.2d 444
> (1995) (overruling *Sinclair v. United States,* 279 U.S. 263, 49 S.Ct. 268, 73
> L.Ed. 692 (1929)); *Ring,* 536 U.S., at 609, 122 S.Ct. 2428 (overruling
> *Walton* [*v. Arizona*], 497 U.S., at 639, 110 S.Ct. 3047[, 111 L. Ed. 2d 511]);
> *Alleyne,* 570 U.S., at ——, 133 S.Ct., at 2162-2163 (overruling *Harris v.
> United States,* 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002)).

*Hurst,* 136 S. Ct. at 623-24. The *Hurst* Court added to this development by expressly

overruling *Spaziano v. Florida,* 468 U.S. 447, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984)

and *Hildwin v. Florida,* 490 U.S. 638, 109 S. Ct. 2055, 104 L. Ed. 2d 728 (1989) "to the

extent they allow a sentencing judge to find an aggravating circumstance, independent of

a jury's factfinding, that is necessary for imposition of the death penalty." 136 S. Ct. at

624. In my view, the Supreme Court's recent dispositive application of the Sixth

Amendment in *Hurst* should be applied in the present case.

---

[6] *Atkins* held that the Eighth Amendment's prohibition against "'[e]xcessive' sanctions" and
"'cruel and unusual punishment'" barred execution of mentally retarded criminals. 536 U.S. at
311, 321 (quoting U.S. CONST. amend. VIII).

7

No. 89590-2
Madsen, J., dissenting

Also, the majority acknowledges that the evidence presented at trial includes expert testimony noting that Davis had an "I.Q. score of 68." *See* majority at 8 n.4 (quoting Report of Proceeding (RP) (May 8, 2007) at 3100). That evidence alone creates a fact question as to whether Davis suffered from an intellectual disability.[7] Again, I do not agree with the majority that such evidence can be disregarded. *See id.*

Here, the trial court summarized the experts' testimony and expressly weighed the evidence and made credibility determinations.[8] The court observed that Dr. Richard Kolbell gave Davis "an IQ test that resulted in a full scale IQ of 68," Clerk's Papers (CP) at 1261, and that Dr. Kolbell testified that Davis "overall showed 'borderline intellectual ability.'" CP at 1262. The court observed that Dr. Zakee Matthews testified that Davis "has a 'major mental illness'" and that "an IQ of 68 as found by Dr. Kolbell would put [Davis] in the mild mental retardation range." CP at 1262-63. The trial court also acknowledged that "the 'impaired' range . . . is the current term used to describe persons who are mentally retarded," CP at 1262, and noted that the State's expert, Dr. Kenneth Muscatel, testified that Davis's "cognitive ability places him in the mild to moderately impaired range." CP at 1264. The court also recognized that all of these mental health witnesses concluded that Davis suffered from a "'cognitive disorder'" and that his "abuse of drugs and alcohol likely exacerbated this condition." *Id.* Nevertheless, the trial court

---

[7] As defined in RCW 10.95.030(2), "intellectual disability" includes in part a "[s]ignificantly subaverage general intellectual functioning," which is further defined to mean an "intelligence quotient [score of] seventy or below." RCW 10.95.030(2)(a), (c).

[8] The court expressly found that "Dr. Muscatel was the most credible witness" and that "his opinions carried the most weight," while "Dr. Matthews was the least credible." CP at 1264. Again, under *Hurst*, such fact finder determinations should have been undertaken and accomplished by the jury rather than the trial court.

8

No. 89590-2
Madsen, J., dissenting

observed that Davis had not been "formally" diagnosed as mentally retarded, CP at 1260, 1265, and noted that the testifying experts declined to so diagnose Davis "to a reasonable psychological [or psychiatric] certainty" because more information would be needed to make such a formal diagnosis. CP at 1261, 1263.[9] The trial court's focus on the absence of a formal diagnosis of mental retardation/intellectual disability, premised on a reasonable psychological certainty, in my view is misplaced. As noted, RCW 10.95.030(2) expressly provides that the defendant need only present evidence to show "an intellectual disability by a *preponderance* of the evidence." (Emphasis added.) Based on the evidence noted above, a reasonable jury weighing the evidence could find that this burden had been met. But more to the point, as discussed above, *Hurst* requires that such evaluation must be performed by a jury, not the trial court.

In sum, the requirement in RCW 10.95.030(2) that "the [sentencing] court must make a finding as to the existence of an intellectual disability," a finding that is crucial to Davis's eligibility for the death penalty, violates the Sixth Amendment under *Hurst*. In my view, *Hurst* requires that we reverse Davis's sentence of death and remand for a new sentencing proceeding. Accordingly, I dissent.

---

[9] Other evidence in the record indicates that as a child, Davis was in special education classes but could not pass his classes and ultimately dropped out of school in the 10th grade. RP (May 9, 2007) at 3243-44 (testimony of Dr. Matthews). Dr. Kolbell testified that based on comparison to earlier testing Davis's mental ability was declining over the years. RP (May 8, 2007) at 3117. Davis showed "fairly significant impairment in his daily functioning," *id.* at 3120 (testimony of Dr. Kolbell), and had trouble functioning throughout his life. RP (May 9, 2007) at 3217-19 (testimony of Dr. Barbara Jessen MD).

9

No. 89590-2
Madsen, J., dissenting

Madsen, J.